THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DINO CONNOR, Defendant-Appellant.

First District (3rd Division) No. 85—20

Opinion filed December 21, 1988.

534

Chester Slaughter and Freddrenna M. Lyle, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry and Anthony J. Carballo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant Dino Connor was charged with armed robbery, armed violence and unlawful restraint. A jury found him guilty of armed robbery, and the trial court sentenced defendant to a term of 17 years. Defendant appeals, contending that he was denied a fair trial as the result of the trial judge's hostility toward defense counsel, the introduction of other crimes evidence, and the ineffective assistance of counsel. He also contends that the sentences of defendant and a codefendant were disproportionate. (Daniel Clay, who is not involved in this appeal, was found guilty of the same offense and was sentenced to a term of six years.)

On October 31, 1982, at about 9:20 p.m., 76-year-old Elmar Runguls was walking near his home when two men accosted him and demanded his money. One man stood in front of Runguls, holding a gun to his head. The other man, later identified as defendant, stood at Runguls' side and went through his pockets. The men took Runguls' wallet, which contained $10 and identification, and ran away.

Runguls returned home and telephoned the police with a description, which was broadcast on the police radio. About 20 minutes later, Runguls identified defendant and Clay in a squad car at his home, and later identified them in a lineup. Runguls testified that the gun recovered from defendant looked like the one used in the robbery.

Officer Michael Keas testified that at about 9:55 p.m. he and his partner saw Clay running, with his arm raised, toward two women in a car stopped at a red light. Clay saw the officers, dropped his arm, and began running the other way. Defendant was standing near a building, and defendant started moving in the same direction as Clay, but they did not speak to each other. Both men were stopped by the officers. Keas found a loaded gun in defendant's waistband. The officers brought the two men to Runguls' home, and Runguls identified them.

It was stipulated that defendant was admitted to bond on November 6, 1982, failed to appear in court on December 6, 1982, and had a bond forfeiture warrant issued for his arrest.

Tondaleo Clinton, defendant's mother, offered alibi testimony for defendant. She stated that defendant was at home with her on October 31 from 8 p.m. until about 10 p.m.

During a sidebar, defense counsel asked to use John Johnson, who was listed as a character witness, as an alibi witness. On the day of trial, counsel had learned that defendant was with Johnson while he repaired a thermostat in defendant's home. The court denied the request and limited Johnson's testimony to character evidence. Johnson, defendant's landlord, testified that defendant was a peaceful, law-abiding person. Carnita Woolfolk testified similarly.

Defendant testified that he was at his mother's home until 9:40 or 9:45 p.m., when he left for his grandmother's home. After leaving, he saw a friend, Marshon Stewart, who offered to sell defendant a gun. Defendant took the gun and agreed to pay Stewart the $40 later. While standing at a bus stop several blocks from his home, defendant and Clay were detained by several police officers. Defendant knew Clay from high school, but they had not spoken to each other near the bus stop.

In August 1982, defendant had been accepted by the Marine Corps. Defendant's full name is Dino E. Clinton Connor. Because he had previously enlisted under the name of Dino Clinton in August 1982, he used the name Connor when he was arrested in October 1982, "to avoid any mix-ups with this here and the government." When he bought the gun from Stewart on October 31, defendant knew he would be leaving for boot camp in about a week. Defendant

had stated in his August 1982 application that he had never been arrested, charged, detained in prison or involved in a court action. He had not taken the final oath when he was charged with these crimes on November 1, 1982. On November 8, 1982, defendant reexecuted the end of the 41-page Marine Corps application as part of his taking the oath required to enter active service. The re-signing included some language indicating it was a reaffirmation of the original application answers.

Defendant was in jail until November 6, 1982, when he was released on bond. Defendant informed someone at the Marine Corps local office of his arrest and was told "Don't worry about it." He assumed the government would "take care of it." Defendant immediately left Illinois for boot camp in San Diego. He testified that he did not appear in court in December because he was in California. After serving in Lebanon, defendant returned to Chicago in November 1983, when he was rearrested for the Runguls robbery.

Anna Cotto testified in rebuttal for the State that between 8:45 p.m. and 9 p.m. on October 31, 1982, she heard a man choking in the gangway outside her window. She opened the window and saw two men robbing her 65-year-old landlord, Edward Hoeltz. One man, whom she later identified as defendant, choked Hoeltz with a necktie while a second man went through his pockets. The man she identified as defendant looked about 17 or 18 years old and wore a maroon jacket and blue jeans. She yelled for them to stop, and defendant looked up at her for about five seconds, standing in the light of the gangway. Cotto did not give the police a description of the men. Several hours later, Cotto identified defendant in a lineup. She could not identify the second man. Cotto testified that she knew Johnnie Flowers and believed he lived in the building next to her apartment, and that defendant lived in the same building.

Flowers testified for defendant in surrebuttal that Flowers and "Smokey" robbed Hoeltz. A woman in a second-floor window yelled down to stop. Flowers was in a lineup on November 29, 1982, but Hoeltz did not identify him.

In November 1983, Flowers entered into a plea agreement and was convicted of six or seven robberies. He was not sure whether the Hoeltz case had been dismissed as part of the plea agreement. Flowers had seen defendant in the neighborhood, but did not know his name.

The defense rested.

The following morning, defense counsel informed the court that when he drove Flowers home the previous day, counsel discovered

Smokey's full name was Kenneth Shenaurlt. Counsel asked to reopen proofs to call Shenaurlt. He made an offer of proof that if Shenaurlt were allowed to testify, he would state that he committed and pled guilty to the Hoeltz robbery. The trial court questioned Shenaurlt outside the presence of the jury. The court and a public defender explained to Shenaurlt that if he had not previously been charged with the crime, he could now be charged. Shenaurlt insisted, "But I was charged."

Shenaurlt told the court that he and Flowers robbed Hoeltz. Shenaurlt said that he pled guilty to the Hoeltz robbery and that he was in fact guilty of the offense.

Shenaurlt did not remember if Hoeltz identified him in a lineup, but he stated that Hoeltz was at the preliminary hearing. Shenaurlt pled guilty to four robberies and received a sentence of four years in prison. He had been released one month before testifying. Defense counsel had contacted him the previous day. Hoeltz did not know Flowers' real name.

After Shenaurlt was dismissed, the State listed four cases to which Shenaurlt had pled guilty, and none involved a victim named Hoeltz. The trial court decided that Shenaurlt would not be allowed to testify in front of the jury because it found Shenaurlt's testimony to be "suspect."

Defendant's principal issue on appeal is that he was denied his right to a fair trial by the erroneous introduction of evidence of two other crimes. Defendant points to evidence of the intended "smash and grab" by codefendant Clay and to Cotto's testimony of the Hoeltz robbery, introduced to rebut defendant's alibi.

 Ordinarily, evidence of separate offenses unconnected with the crime for which a defendant is on trial is incompetent. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Harris* (1970), 46 Ill. 2d 395, 263 N.E.2d 35.) It infers that because a man has committed other crimes he is more likely to have committed the current crime. *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

Evidence of other crimes may be admitted, however, if *e.g.*, it tends to show motive, intent, knowledge, plan, design or identification (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Young* (1983), 118 Ill. App. 3d 803, 455 N.E.2d 845), or if it tends to disprove an alibi (*People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. Harris* (1970), 46 Ill. 2d 395, 263 N.E.2d 35; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292). Here, Cotto's testimony that she saw defendant robbing Hoeltz at 8:45 or 9

p.m. was introduced to rebut defendant's testimony that he was with his mother until 9:45 p.m. and to rebut Clinton's testimony that her son was home from 8 p.m. until 10 p.m. (See *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.) Moreover, that evidence, showing that within an hour defendant was involved in another armed robbery with the same companion, in which other similarities were also present, was admissible for a purpose other than to show defendant's propensity to commit crime and was therefore admissible. See *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.

Similarly, the other crimes evidence relating to the smash and grab incident was admissible only for the purpose of showing the circumstances surrounding defendant's arrest. (See *People v. Martin* (1984), 121 Ill. App. 3d 196, 459 N.E.2d 279.) The admission of other crimes evidence is within the sound discretion of the trial court. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821; *People v. Lieberman* (1982), 107 Ill. App. 3d 949, 438 N.E.2d 516.) In exercising its discretion, the trial court must balance the probative value of the evidence to establish the purpose for which it is offered against the prejudicial effect of such evidence on defendant. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666; *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) In this case, we find no abuse of discretion.

Defendant also contends that the hostility of the trial judge toward defense counsel denied defendant his constitutional right to a fair trial.

■■ ■ The trial court must carefully avoid any remarks that indicate a prejudice toward either side in order to protect defendant's right to a fair and impartial trial by jury in a criminal case. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) It is not within the judge's province to convey his opinions, by word or by deed, on such matters as the credibility of witnesses and the weight to be afforded their testimony. Jurors are "ever watchful of the attitude of the judge, and any disclosure of disbelief or hostility on his part is very apt to influence them in arriving at their verdict." (*People v. Santucci* (1962), 24 Ill. 2d 93, 98, 180 N.E.2d 491; see also *People v. Sprinkle* (1963), 27 Ill. 2d 398, 189 N.E.2d 295; *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 449 N.E.2d 568.) A verdict will not be disturbed unless the judge's remarks constituted a material factor in the conviction or unless prejudice to the defendant appears to be their probable result. (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 449 N.E.2d

568; *People v. Parker* (1976), 40 Ill. App. 3d 597, 352 N.E.2d 394.) In the present case, we find that the record reveals any improper conduct of the trial judge towards defense counsel did not constitute a material factor in defendant's conviction.

Several times the court admonished defense counsel regarding his physical movements in the courtroom. At one point, the court excused a witness and announced, "Call your next witness." Defense counsel stepped out of the courtroom to get his next witness from the hallway. In counsel's absence and in front of the jury, the judge stated, "I don't know where he is going." The prosecutor replied, "To get his witness." The judge answered, "He wasn't excused." When counsel returned, the trial judge admonished him.

In another incident, defense counsel attempted to show defendant an exhibit, and the court admonished him:

"DEFENSE COUNSEL: Showing you what has been marked as People's—

THE COURT: Are you seeking permission to approach the witness?

DEFENSE COUNSEL: Yes.

THE COURT: I will appreciate it if you ask that and conduct yourself accordingly.

DEFENSE COUNSEL: May I approach the witness, your Honor?

THE COURT: Yes."

These two minor incidents can hardly have suggested to the jury that defense counsel attempted to present the case in an improper manner. Other comments made by the court and quoted at length by defendant were all made outside the presence of the jury, and thus we find no evidence that they materially influenced the conviction.

■ Defendant also contends he was denied the effective assistance of counsel. In order to establish ineffective assistance of counsel, defendant must show that counsel committed errors so serious that counsel was not functioning as the counsel guaranteed by the sixth amendment and that the errors were prejudicial to his defense. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) Defendant argues that his attorney failed to interview certain witnesses. We find nothing in the record indicating counsel failed to interview Woolfolk or Flowers, both of whom testified for defendant at trial. Counsel did interview Johnson before trial and either did not learn of his alleged alibi testimony at that time, or accurately observed that it conflicted with the alibi offered by defendant's mother.

Furthermore, counsel's failure to file a motion *in limine* or objection directed toward Cotto's rebuttal testimony would have been pointless where that testimony was properly admitted. *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

■ We conclude that these, along with the several examples of counsel's failure to make an objection, fail to show counsel made errors so serious that he was not functioning as the counsel guaranteed by the sixth amendment or that counsel's errors were in fact prejudicial to the defense.

■ Finally, defendant contends that the imposition of a 17-year prison term on defendant was an abuse of discretion. We agree. Codefendant Daniel Clay received a six-year sentence. A disparate sentence may be supported by a more serious criminal record or greater participation in the offense. (*People v. Martin* (1980), 81 Ill. App. 3d 238, 401 N.E.2d 13.) Defendant had no adult criminal record, while Clay did have a record. Their participation was not disproportionate. Defendant took the victim's wallet and searched his pockets while Clay held a gun pointed at the victim's head. Neither entered into a plea agreement. Thus, the relevant factors here do not justify the disparate sentences. We recognize that the court could consider defendant's bond forfeiture, but we find that, in view of Clay's sentence, the trial court abused its discretion in imposing a 17-year sentence on defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed, the sentence is vacated, and the cause is remanded for a new sentencing hearing.

Judgment affirmed; sentence vacated and cause remanded.

WHITE, P.J., and FREEMAN, J., concur.