THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TOMMY LEE JACKSON, Defendant-Appellant.
First District (4th Division)   No. 1—85—3553

Opinion filed May 10, 1990.

Randolph N. Stone, Public Defender, of Chicago (Vicki Rogers and Robert P. Isaacson, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Lynda A. Peters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial the defendant, Tommy Lee Jackson, was convicted of murder and rape. He was sentenced to a term of natural life imprisonment for murder and a consecutive extended term of 60 years for rape. On appeal, the defendant contends that his confession should have been suppressed because it was obtained in violation of his fifth amendment right to counsel and that the trial court erred in allowing the jury to hear evidence that he failed a polygraph examination. The defendant further contends that he was denied a fair trial by the State's violation of the discovery rules, the introduction of hearsay testimony concerning other crimes and the prosecutor's references to prejudicial factors concerning the victim's life. The defendant also maintains that the trial court erred in prohibiting him from cross-examining a State witness on the witness' expectation of leniency, allowing testimony of the defendant's post-arrest silence, admitting improper rebuttal testimony and considering victim-impact testimony at the sentencing hearing.

On August 10, 1982, police discovered the body of Mary Beth Duncavage in her apartment at 714 West Buckingham Street in Chicago. Her body was lying facedown in the bedroom with her legs tied to a radiator. There was evidence of sexual assault, and it was determined that the cause of death was strangulation. Duncavage's body was badly decomposed, leading the police to believe that she had been killed on August 4, 1982. On that date, a man identifying himself as Michael West telephoned 911 and reported that he heard a woman screaming in a first-floor apartment at 714 West Buckingham. He further stated that he heard someone running around the first floor on the left side and described the possible offender as a white male with long, slicked-back black hair wearing blue jeans, a blue jean jacket and boots. Two officers responded to the call at approximately 4 a.m. They remained in the building for 15 minutes but left when they did not hear or see anything to substantiate the call.

The following evidence was presented at a hearing on the defendant's motion to suppress. In late August of 1983, the defendant was arrested on charges of home invasion and rape unrelated to the in-

stant cause. After being advised of his *Miranda* rights, he confessed to those charges. On September 2, 1983, the defendant was arraigned and an assistant public defender was appointed to represent him.

On September 6, 1983, Detectives John Thomas, Bernard Richter and Gerald Mahon obtained a writ to have the defendant transferred to the Area 6 police station for questioning. A day earlier, they had received information from two acquaintances of the defendant, Sean Sullivan and Reginald Perry, that led them to suspect the defendant's involvement in the Duncavage murder. Sullivan and Perry were in police custody for offenses unrelated to the Duncavage homicide. Perry told police that in August of 1983, the defendant told Sullivan and Perry that he had raped and killed two women on the north side of Chicago. In one instance, he choked the woman and placed her in a bathtub filled with water; in the other instance he strangled the woman and tied her to a bed, dresser or radiator in her bedroom. When played the 911 tape, Perry identified the voice as that of the defendant.

The defendant arrived at the police station for questioning on September 7, 1983. According to the police officers, he was advised of his constitutional rights on several occasions, prior to each conversation with the police. The defendant indicated that he understood his rights and would like to answer questions. The police did not contact the attorney appointed for the defendant on the unrelated rape charge. The officers testified that the defendant was never threatened, beaten or coerced in any manner and that he was given food and allowed to use the washroom. At approximately 6:30 p.m., the defendant was taken to another police station for a polygraph examination. The examination covered homicide investigations involving Mary Beth Duncavage, Faustina Gray and Marilyn Dods. On the return trip to Area 6, the defendant asked how he did on the test. The detective merely replied, "You know how you did."

At 10 p.m. the defendant was again given the *Miranda* warnings. He did not request an attorney. At that time, the defendant was confronted with the statements of Sean Sullivan and Reginald Perry and was informed that he had failed the polygraph examination. The defendant was left alone until 11 p.m., when he was once again advised of his constitutional rights. The defendant stated that he wanted to tell the truth and admitted to killing Mary Beth Duncavage and Faustina Gray.

Assistant State's Attorney Richard Beuke arrived at 12 a.m. on September 8, 1983, gave the defendant the *Miranda* warnings, showed him some photographs and played the first half of the 911

tape. The defendant identified the voice as his own and was able to accurately state what was on the second half of the tape before it was played for him. The defendant slept for a while, then ate some food that was brought for him. Between 4:35 a.m. and 4:45 a.m., the defendant gave a court-reported statement concerning the death of Mary Beth Duncavage. At 6:20 a.m., he gave a court-reported statement concerning the death of Faustina Gray. The defendant was then questioned about two other murders which he denied committing.

Sue Coleman, the assistant public defender appointed to represent the defendant on September 2, 1983, on the unrelated rape charge, testified at the suppression hearing that she was never contacted by the police or by the State's Attorney's office regarding the questioning of the defendant concerning the Duncavage or Gray homicides. The trial court denied the motion to suppress, finding that the defendant's confession was voluntary and that no violation of his constitutional rights had occurred.

During opening arguments, the State made several references to the life, interests and career of Mary Beth Duncavage, including the fact that she was a medical student with an interest in dance. Objections to these comments were sustained. At trial, the State first presented the testimony of Dr. Paul Canale, who had attended medical school with Duncavage. Canale stated that on August 1, 1982, he helped Duncavage move into her apartment on Buckingham Street. At that time, he saw three black men walk by, then walk back toward them. As Duncavage came down the steps, one of the men said something like, "[H]ey, Mabel," under his breath. Canale identified the defendant in court as the man who made the comment. Canale then stated that he informed the police about the three black men shortly after Duncavage's death. He viewed police photographs but was unable to make an identification. On September 9, 1983, he saw the defendant's picture in the newspaper in connection with the Duncavage case, recognized him and contacted the police. The defendant objected and moved for a mistrial based on Canale's testimony on the grounds that the State violated the discovery rules by not tendering his statement to the defense. The motion was denied.

Reginald Perry testified that the defendant was present during the last week of August 1983 when Perry and Sean Sullivan argued over how much force was used in a purse snatching committed by Perry and Sullivan. Sullivan had thrown the woman down and kicked her in the head. The defendant said that Sullivan was right in what he did and that they should never be afraid to "kill a bitch." The defendant told them that he had sexually assaulted a woman in an

apartment near Broadway and Clark, then choked her, placed her in a bathtub filled with water and hit her head on the tub. He also told them how he broke into another woman's apartment, sexually assaulted her, strangled her and tied her body to a dresser, bed or radiator. He said that he took a radio, money and jewelry from the apartment. Prior to Perry's testimony, the defense made a motion to bar the testimony based on a defense investigation which revealed the possibility that Perry had been promised leniency with regard to a pending murder case in which he was a suspect in exchange for his testimony. The State repeatedly denied any promises of leniency, and the court denied the motion. Following a *voir dire* examination of Perry, the court prohibited the defense from cross-examining Perry about the murder investigation. Further details concerning this issue will be related later in the opinion.

The State then presented evidence of the defendant's confession to the Duncavage murder. Detective Gerald Mahon testified that at approximately 10 p.m. on September 7, 1983, he and Detective Richter advised the defendant of his *Miranda* rights, after which the defendant indicated that he would talk to them. Mahon then told him they believed he was involved in several murders on the north side, to which the defendant made no reply. The defendant objected to this testimony as evidence of the defendant's post-arrest silence. Mahon then testified, over a defense objection, about four murder cases concerning which the defendant was questioned. The detectives told the defendant that two friends of his stated that the defendant told them he "had killed white women and put them in bathtubs. Further, that [he] had raped women and tied them up." He also told the defendant that his voice had been identified on the 911 tape. At 11 p.m., the defendant told Mahon and Richter that one night during the summer of 1982 he climbed into an open window in an apartment building, took a knife from the kitchen and encountered a woman. He tied her feet to a radiator, raped her and removed some items from the apartment. When he returned to the apartment, he saw that the woman was not moving and became scared. He called the police using the name Michael West and told them a phony story.

At 2 a.m., the defendant gave a similar statement to Assistant State's Attorney Beuke. The defendant further stated that he placed a belt around the woman's neck and a pillow over her head to keep her from screaming. In a court-reported statement made at 4:35 a.m., the defendant explained that he used the name Michael West because it was the name of someone he knew from the Maryville Academy, where he once lived. He said that he sold the victim's property to peo-

ple on the street and at the beach.

The defense began its case by presenting evidence concerning the Faustina Gray murder, to which the defendant confessed shortly after confessing to the Duncavage murder. Officer James Goff testified that at 1 p.m. on May 26, 1982, he responded to a report of a fire at 4027 North Paulina. He found the body of an Hispanic woman submerged in a bathtub full of water, with the hands tied behind the back.

Assistant State's Attorney Beuke testified that in the defendant's confession to the Gray murder, he said that he went to the rear of the home, kicked a hole in the basement door and went inside. He found a woman on the second floor and hit her in the head with a trophy when she screamed. He tied her up, raped her and put her in the bathtub. When she began to regain consciousness, he hit her head against the tub and left her facedown in the tub. He then ran downstairs and started a fire.

The defendant then called Chief Warrant Officer Gerald Gabriel of the United States Navy. During 1982, Gabriel worked in the brig at the Great Lakes Naval Station. He identified a disciplinary action data card which showed that the defendant was a fireman recruit from San Diego, California, who had been sentenced to the brig from April 9, 1982, until May 28, 1982. The confinement order showed that he arrived at the Great Lakes Naval Station brig on April 22, 1982.

Gabriel testified that an inspection record revealed that the defendant was in segregation from May 19, 1982, until May 28, 1982. Inspections were made every 15 to 30 minutes, and the inspection records contained signatures from guards who observed the defendant in his cell at 1 p.m. on May 26, 1982, the time when Faustina Gray was killed. On cross-examination, Gabriel admitted that although the hospital records indicated that the defendant was out of his cell for medical treatment on May 21, 1982, the inspection records showed that he was observed in his cell all day. The State then questioned Gabriel about military records of an individual named David Allen West and about the Navy annual inspector general's report on the brig for April 1982 to April 1983. The defense objected because West had not been listed as a witness and the report had not been tendered to the defense. The objections were overruled. Gabriel then testified that the brig had failed an inspection in the areas of security and record keeping.

The defendant testified that he lived at Maryville Academy from 1975 until 1980 and that there was no one named Michael West at the school. He was in the brig at Great Lakes on the date of the Gray homicide and was released two days later. During the summer of

1982, he lived in the Elk Grove Village area until late August, when he moved to the north side of Chicago.

The defendant stated that on September 7, 1983, he was taken to the Area 6 police station, shown photographs of dead women and questioned about the murders. He was repeatedly beaten by the officers, threatened and told to confess. His requests for an attorney and to make a phone call were denied. He was then told that Perry and Sullivan said he committed the murders. When the defendant finally agreed to confess, he was shown photographs, played a tape and told what to say in each case. He rehearsed two murder confessions, then gave court-reported statements. The defendant testified that he did not escape from the brig on May 26, 1982, and that he did not rape and murder Mary Beth Duncavage or Faustina Gray. He confessed only because he felt mentally manipulated, coerced and threatened and because he was confronted with people who said he had committed the murders.

On cross-examination, the defendant admitted being AWOL three times while in the Navy. He denied selling a radio to Demetrio Hernandez on August 10, 1982. Over a defense objection, the State then asked the defendant whether, shortly before he confessed, he was told that he had failed a polygraph examination. The defendant replied that he was told that he failed to answer some of the questions truthfully.

The Reverend John Smyth, executive director of Maryville Academy, testified that the defendant was a student there from 1975 until 1980. It was his opinion that the voice on the 911 tape was not that of the defendant. Also, there was never a student at Maryville named Michael West. D. LeBel and Linda Vancil, acquaintances of the defendant, also testified that the voice on the tape was not the defendant's voice.

Police officer Chris Grogman testified that he spoke with Paul Canale during his investigation of the Duncavage case and that his report did not indicate that Canale told him about three black men who walked by the building on August 1, 1982.

Lieutenant Commander James Majority testified that he had been the commanding officer of the Great Lakes Naval Brig since July of 1983. He testified that although the brig had failed an inspection in 1982, it had received outstanding ratings in certain sections. When he took command, there were no problems of escapes from maximum security or falsification of records.

The State presented several rebuttal witnesses. Demetrio Hernandez testified that sometime after he heard about the Duncavage mur-

der, the defendant sold him a radio for $30. He saw the defendant several times on the north side of Chicago in mid-August of 1982. David Allen West testified that he was stationed at the Great Lakes Naval Station from 1980 to 1983 and left the base seven or eight times without permission. In May of 1982 he was in the brig in the medium security unit. During that time he and another prisoner were left outside the brig unattended for one hour. He had never been in the maximum security unit.

Detective Richter, Detective Mahon and Assistant State's Attorney Beuke again testified concerning their treatment of the defendant on the day he confessed. In addition, Richter testified that on the way back from the polygraph examination, the defendant asked how he did and was told they would discuss it later. Shortly before the defendant confessed, he was told that he had failed the examination. Mahon corroborated this testimony. The jury was subsequently instructed that evidence concerning the polygraph was not to be considered as evidence of the defendant's guilt but was to be used solely to evaluate the issue of whether his confession was the result of coercion or the product of a free will. At the exhibits conference, the defendant objected to a photograph of Mary Beth Duncavage wearing a dancer's outfit. The objection was overruled, and the photograph was allowed to go to the jury.

The facts concerning the sentencing hearing, which included victim-impact testimony by Mary Beth Duncavage's mother, will be set forth later in connection with our discussion of that issue.

The first issue before us is whether the defendant validly waived his fifth amendment right to have counsel present during custodial questioning concerning the Duncavage murder. Prior to questioning in this matter, the defendant was arrested on an unrelated charge and informed of his constitutional rights. At that time, the defendant confessed to the unrelated charge. The defendant was then arraigned on that charge and accepted the appointment of counsel. Sometime after the arraignment, the police attempted to question the defendant about the instant offense. The defendant was informed of his *Miranda* rights, after which he made the statements he now seeks to suppress. The defendant concedes that at the time he was questioned about the Duncavage murder, his sixth amendment right to counsel had not yet attached on that charge. However, he maintains that his acceptance of counsel at arraignment on the unrelated charge also constituted an invocation of his fifth amendment right to counsel on the instant charge which could not be waived by responding to further police-initiated questioning. A brief discussion of the sources and application of the

fifth and sixth amendment rights to counsel is helpful in resolving this issue.

■ The fifth amendment guarantees that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) To ensure the integrity of this constitutional protection, the United States Supreme Court in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, held that because of the inherently coercive nature of custodial interrogation, there is a right to have counsel present during custodial interrogation. To demonstrate a waiver of the fifth amendment right to counsel, the State must show that the individual understood his right to have counsel present and that he knowingly, voluntarily and intelligently decided to abandon it. (*Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338.) In *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, in order to lend substance to the right to counsel as stated in *Miranda*, the Court held that once an individual invokes his right to have counsel present during custodial interrogation, all questioning must cease until counsel is made available. To demonstrate a waiver after the right to counsel has been invoked, the State must establish that the accused himself initiated the further communication with police. As stated in *Edwards*, "an accused, *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.) In *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093, the Court held that the bright-line rule stated in *Edwards* applies in the context of questioning in a separate investigation. The *Roberson* Court explained that "the presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." *Roberson*, 486 U.S. at 683, 100 L. Ed. 2d at 715, 108 S. Ct. at 2099.

■ The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to *** have the Assistance of Counsel for his defence." (U.S. Const., amend. VI.) The sixth amendment right to counsel attaches at the time that judicial proceedings have been initiated against the accused, whether by way of formal charge, preliminary hearing, indictment, information, or arraign-

ment. (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239.) It is at that time that the government has committed itself to prosecute, and the accused finds himself "faced with the prosecutorial forces of organized society." (*Maine v. Moulton* (1985), 474 U.S. 159, 170, 88 L. Ed. 2d 481, 492, 106 S. Ct. 477, 484.) The sixth amendment right to counsel extends to every critical stage of the prosecution, including post-indictment interrogation. (*Brewer*, 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) Unlike the fifth amendment right to counsel, the sixth amendment right to have counsel present during critical stages of the prosecution does not depend on whether or not the accused is in custody. (*United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926.) Also unlike the fifth amendment right to counsel, the sixth amendment right is limited to charges on which judicial proceedings have been initiated; the right has not been extended to provide counsel during questioning on unrelated charges. *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877; *cf. United States v. Gouveia* (1984), 467 U.S. 180, 81 L. Ed. 2d 146, 104 S. Ct. 2292 (where the Supreme Court declined to carve out an exception to the holding in *Kirby*).

In *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, the Court applied the *Edwards* rule, which was developed to safeguard the fifth amendment right to counsel, in determining whether an accused who requested counsel at an arraignment had waived his right to have counsel present during subsequent interrogation by responding to police questioning after waiving his *Miranda* rights. The Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." (*Jackson*, 475 U.S. at 636, 89 L. Ed. 2d at 642, 106 S. Ct. at 1411.) The Court reasoned that because the sixth amendment right to have counsel present at all critical stages of the prosecution, including post-indictment questioning, is as important as the fifth amendment right to have counsel present during custodial interrogation, it is deserving of the same level of protection.[1] However, in *Patterson v. Illinois* (1988), 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389, the Court refused to apply the *Edwards* rule to invalidate a *Miranda* waiver by an accused who was questioned after having been indicted, but before he

---

[1]In a dissent, Justice Rehnquist persuasively argued that the application of the *Edwards* rule in the context of the sixth amendment does not make sense.

had requested counsel at his arraignment. The Court reasoned:

"The fact that petitioner's Sixth Amendment right came into existence with his indictment, *i.e.*, that he had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned." *Patterson*, 487 U.S. at 290-91, 101 L. Ed. 2d at 271, 108 S. Ct. at 2394.

■ The defendant in the case at bar, relying upon *United States ex rel. Espinoza v. Fairman* (7th Cir. 1987), 813 F.2d 117, maintains that when he accepted the appointment of counsel at his arraignment on an unrelated charge, he was invoking not only his sixth amendment right to have counsel present at all critical stages of the prosecution on that charge, but also his fifth amendment right to have counsel present during all custodial interrogation. The significance of this contention is that the sixth amendment right prohibits police-initiated questioning only on offenses with which the defendant has been formally charged, while invocation of the fifth amendment right would prohibit all police-initiated questioning during continuous custodial interrogation, including questioning on unrelated charges. *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093.

In *Espinoza*, the defendant requested counsel at his arraignment on a weapons charge. Subsequently, while still in custody and after having received the *Miranda* warnings, he confessed to an unrelated murder. In holding the confession inadmissible, the court stated that under the decision in *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, "we are required to presume that an individual who requests counsel at his or her arraignment is asserting both a Sixth Amendment and a Fifth Amendment right." (*Espinoza*, 813 F.2d at 123.) Because *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093, prohibits all police-initiated questioning of an accused in custody who has invoked his fifth amendment right to counsel, the defendant's *Miranda* waiver was therefore invalid. However, in a footnote, the *Espinoza* court alluded to the idea that the presumption that an individual who requests counsel at his arraignment is invoking both his sixth and fifth amendment rights to counsel may not arise in a case where the accused confesses to a crime prior to his arraignment on that crime. In that situation, there is no basis for presuming that the request for counsel at arraignment indicated an unwillingness or inability to deal with the police except through counsel. *Espinoza*, 813 F.2d at 123 n.5.

We do not agree with *Espinoza*'s conclusion that *Michigan v.*

*Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, mandates a presumption that an accused who requests counsel at his arraignment on a particular charge is also invoking his fifth amendment right to have counsel present during custodial interrogation. *Jackson* merely held that once an accused invokes his right to counsel at arraignment on a particular charge, the police may not initiate further questioning on that charge in the absence of counsel. The court noted that the sixth amendment right to counsel includes the right to have counsel present at post-arraignment interrogation and that "the Sixth Amendment right to counsel at a postarraignment interrogation requires at least as much protection as the Fifth Amendment right to counsel at any custodial interrogation." (*Jackson*, 475 U.S. at 632, 89 L. Ed. 2d at 639, 106 S. Ct. at 1408-09.) For that reason, the court extended the *Edwards* rule to the sixth amendment context and held that where an accused requests counsel at arraignment, a showing that he was subsequently advised of his *Miranda* rights and that he acquiesced in police-initiated questioning is insufficient to establish a valid waiver of his right to counsel. In the words of the *Jackson* court, "[j]ust as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." (*Jackson*, 475 U.S. at 635, 89 L. Ed. 2d at 642, 106 S. Ct. at 1410-11.) In our view, *Jackson* was decided wholly in the context of the sixth amendment and provides no support for the defendant's contention that an accused who requests counsel at arraignment is presumptively also invoking his fifth amendment right to have counsel present at all custodial interrogation.

Nor is there any analytical support for this contention. The essence of the protections provided by *Miranda* and *Edwards* is to safeguard the fifth amendment right to counsel of an accused who has indicated an inability or unwillingness to cope with the pressures of custodial interrogation. As stated in *Arizona v. Roberson* (1988), 486 U.S. 675, 681, 100 L. Ed. 2d 704, 713, 108 S. Ct. 2093, 2097-98:

"[T]he prophylactic protections that the *Miranda* warnings provide to counteract the 'inherently compelling pressures' of custodial interrogation and to 'permit a full opportunity to exercise the privilege against self-incrimination' [citation] are implemented by the application of the *Edwards* corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest,

and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect."

At arraignment, no interrogation is taking place. Absent the pressures of custodial interrogation, there is no reason to presume that an accused who requests counsel to assist in his defense is also indicating an inability or unwillingness to deal with the police except through counsel. Such a presumption would be especially untenable in the instant cause, where the defendant confessed to the unrelated charge prior to his arraignment on that charge. He subsequently waived his *Miranda* rights and confessed to the instant offense. Never at any time did the defendant indicate that he was unable or unwilling to deal with police questioning without the aid of counsel. By requesting counsel at his arraignment on the unrelated charge, the defendant was invoking his sixth amendment right to have counsel present at all critical stages of the prosecution on that charge, including post-arraignment interrogation. Under *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, the police were prohibited from initiating further questioning on that charge. However, we find no basis for concluding that they were also prohibited from advising him of his *Miranda* warnings and asking him if he would be willing to answer questions about an entirely unrelated investigation. As stated in *Patterson v. Illinois* (1988), 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389, the fact that a right to counsel exists does not necessarily mean that it has been invoked. "Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny—not barring an accused from making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone." (*Patterson*, 487 U.S. at 291, 101 L. Ed. 2d at 271-72, 108 S. Ct. at 2394.) If the defendant at any time during questioning on the instant offense had asked for counsel or indicated that he had just been given counsel at his arraignment, all questioning would have stopped pursuant to *Edwards* and *Roberson*. There is little chance, as there was in *Edwards*, that the defendant would have perceived the *Miranda* warnings in this context as a denial of his right to have counsel present during custodial interrogation. We conclude that the fact that the defendant accepted the appointment of counsel at his arraignment on an unrelated charge did not serve to invalidate his waiver of the right to have counsel present during questioning on the instant offense. Our decision is in accord with recent decisions of the State supreme courts of Washington, Michigan and Arizona. *State v. Stewart*

(1989), 113 Wash. 2d 462, 780 P.2d 844, *cert. denied* (1990), 494 U.S. 1020, 108 L. Ed. 2d 502, 110 S. Ct. 1327; *People v. Crusoe* (1989), 433 Mich. 666, 449 N.W.2d 641; *State v. Hitch* (1989), 160 Ariz. 297, 772 P.2d 1150.

The defendant next contends that the trial court erred in allowing the jury to hear evidence that he failed a polygraph examination. Essentially, the defendant testified at trial that his confession was coerced by repeated threats of physical violence. In rebuttal, the State introduced testimony that the defendant confessed shortly after he was told that he had failed a polygraph examination. The jury was instructed that the testimony was not to be used as evidence that the defendant lied, but rather to determine whether the confession was voluntarily given. In ruling that the polygraph evidence was admissible for that limited purpose, the trial court relied upon *People v. Triplett* (1967), 37 Ill. 2d 234, 226 N.E.2d 30.

In *Triplett*, evidence was presented at a hearing on a motion to suppress that the defendant told a deputy sheriff that he would take a lie detector test and that if he failed it he would tell the truth. At his jury trial, the defendant testified on cross-examination that he agreed to take a lie detector test and that he was told that the test showed he was lying. Defense motions for a mistrial and that the jury be instructed to disregard the testimony were denied. On appeal, the State argued, as it does here, that evidence concerning the polygraph examination is admissible on the issue of voluntariness of a confession. The court recognized that although Illinois law manifests a strong aversion to the admissibility of polygraph evidence, "it can be argued that a different result should follow when the issue is the voluntariness of a confession." (*Triplett*, 37 Ill. 2d at 239, 226 N.E.2d at 32.) The court further stated that "[i]t can be said that the fact that the confession followed a polygraph examination is a relevant circumstance and that it is the fact of the examination, rather than its result, that is significant." (*Triplett*, 37 Ill. 2d at 239, 226 N.E.2d at 32.) The court held, however, that because no limiting instruction was given to the jury, a new trial was required regardless of whether or not the evidence was admissible.

The defendant argues that the supreme court decisions in *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070, and *People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493, indicate that the court considers polygraph evidence inadmissible for any purpose. In *Baynes*, the court held that the unreliability of polygraph tests is so great that the results could not be admitted at trial even by stipulation. In *Yarbrough*, the court held that a trial court could not rely

upon polygraph results in ruling on a post-trial motion which raised the sufficiency of the evidence. The underlying rationale for both *Baynes* and *Yarbrough* was the fear that the fact finder would consider the polygraph results as conclusive. Neither *Baynes* nor *Yarbrough* dealt with the admissibility of polygraph evidence for the limited purpose of determining the voluntariness of a confession.

■ We believe that the evidence showing that the defendant failed the polygraph examination was admissible for the limited purpose of showing that it was his failure to pass the test, rather than the alleged threats of violence by the police, which motivated the defendant to confess. The larger question raised by the defendant is whether a limiting instruction under these circumstances can ever be effective. The supreme court decisions in *Baynes* and *Yarbrough* indicate that the danger in admitting polygraph evidence is that the finder of fact may regard such evidence as conclusive on the issue of the defendant's guilt. In *People v. Escobar* (1988), 168 Ill. App. 3d 30, 44-45, 522 N.E.2d 191, this court held that a reference to the fact that the defendant had failed a polygraph test was at most harmless error in light of the strength of the State's case. Here, the State presented overwhelming independent evidence to establish that the defendant's confession was true and that he had committed the Duncavage murder. The physical evidence at the crime scene relating to the condition in which the victim was found matched the statements made in the defendant's confession. The defendant's voice was identified as the voice on the 911 call received by police at the time the murder was committed. When half of the 911 tape was played to the defendant, he was able to accurately state what was said on the remainder of the tape. Reginald Perry testified that the defendant told Perry and Sean Sullivan that he had broken into a woman's apartment, sexually assaulted her, strangled her and then tied her body to a bed or radiator. Even if we were to agree with the defendant's contention that error occurred, we are convinced that the error was harmless given the overwhelming evidence of guilt.

■ The defendant next contends that the State denied him his right to a fair trial by committing several violations of the discovery rules. Specifically, he maintains that the State failed to disclose to the defense: a statement by witness Paul Canale; the State's intention to use the inspector general's report for the Great Lakes Navy Brig; its intention to call David Allen West and Demetrio Hernandez as rebuttal witnesses; and the promise of leniency made to Reginald Perry.

The first alleged violation concerns the statement made by Paul Canale that he saw three black men, including the defendant, outside

of Duncavage's apartment building on August 1, 1982. The State maintains that the statement had never been written or memorialized in a summary and was therefore not discoverable under Supreme Court Rule 412(a)(i). (107 Ill. 2d R. 412(a)(i).) Officer Grogan, a defense witness, testified that during his investigation he spoke with Canale and that his report did not indicate that Canale told him about seeing three black men outside of the apartment building. The defendant argues that although there is no indication that Canale's statement was written, there can be "little doubt that the State interviewed the witness prior to trial and made a summary of what he said." This amounts to conjecture and is insufficient to establish a discovery violation on the part of the State. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 418, 539 N.E.2d 1186.) Moreover, the record shows that although the defendant made a motion for a mistrial at the end of Canale's testimony, which was denied as untimely, he did not move for a continuance at the time he learned of the statement. Failure to seek a continuance generally waives a claim of error based on surprise. (*People v. Nelson* (1980), 92 Ill. App. 3d 35, 45, 415 N.E.2d 688.) Under the circumstances presented here, we do not believe that a new trial was warranted.

The next discovery violation alleged by the defendant involves the State's failure to inform the defense that it intended to use an inspection report during the cross-examination of Officer Gabriel. Supreme Court Rule 412(a)(v) requires the prosecution to disclose "any books, papers, documents, photographs or tangible objects which the prosecuting attorney intends to use in the hearing or trial." (107 Ill. 2d R. 412(a)(v).) Although the defendant claims on appeal that he was surprised and prejudiced by the inspection report, he did not request a continuance to examine its contents. The defendant subsequently used the report during his examination of Lieutenant Majority. We do not believe that the defendant has made a sufficient showing of prejudice to warrant reversal on this issue.

The next alleged discovery violation concerns the State's failure to inform the defense that it intended to call David Allen West and Demetrio Hernandez as rebuttal witnesses. The State informed the defendant of its intention to call West sometime during the defense case. It declared its intention to call Hernandez after the defense rested. The court allowed defense counsel time to interview the witnesses prior to their testimony. West testified concerning the lack of security at the Navy brig, and Hernandez testified that the defendant sold him a radio on the north side of Chicago at a time when the defendant testified he was living in a northwest suburb. Because the

State may not know if a witness will be called in rebuttal until the defense testimony is heard, the State need not inform the defense of its intention to call a rebuttal witness until that intention has been formed. (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 932, 420 N.E.2d 773.) Even where the State does not strictly comply with this rule, the decision of whether or not to exclude a rebuttal witness rests within the sound discretion of the trial court. (*People v. Pitts* (1982), 104 Ill. App. 3d 451, 457, 432 N.E.2d 1062.) In the case at bar, the State argued to the trial court that it did not form its intention to call Hernandez until after it had heard the defendant's testimony about living in a northwest suburb and that it did not form the intention to call West until it heard Gabriel's testimony concerning the security of the brig. The court ruled that the witnesses would be allowed to testify after the defendant had an opportunity to interview them. We are unable to conclude that this ruling constituted an abuse of discretion.

The next alleged discovery violation is the State's failure to inform the defendant and the jury that Reginald Perry was promised leniency in exchange for his testimony. Although both Perry and the State maintained throughout the course of the trial that no promise of leniency had been made, Perry later testified after his indictment on a murder charge that the State promised him immunity from prosecution on that charge in exchange for his testimony against the defendant. Perry's testimony concerning the promise of immunity was contradicted by the prosecutor who handled the instant cause. There is absolutely no basis upon which we can conclude that the alleged promise of leniency was a fact that the State was required to disclose to the defendant pursuant to the discovery rules.

■■ ■ The defendant next contends that the trial court erred in prohibiting him from cross-examining Perry about his expectation of leniency with respect to a murder investigation in which he was the prime suspect. Prior to trial, defense counsel moved for discovery of any promises of leniency that had been made to Perry. The State represented that no promises had been made, and the trial court ordered a *voir dire* examination of Perry. It was discovered that Perry was being held in the witness quarters rather than the county jail because he feared the defendant. Once, after Perry had been arrested, the prosecutor obtained an "I" bond to keep him out of the jail where the defendant was incarcerated. Regarding the pending murder investigation, the prosecutor stated that "great pains" were taken to keep Perry from knowing that he was a suspect "so he wouldn't come in expecting anything, hoping for anything." Perry testified at the *voir*

*dire* that to his knowledge he was not under investigation for the murder of Ivan Leon, which occurred on August 8, 1985. Perry further testified that no promises of leniency on any case, pending or future, had been made by the prosecution. Based on this testimony, the trial court ruled that the defendant would not be permitted to cross-examine Perry concerning any expectations of leniency with respect to the Leon murder. At trial, Perry testified that he had not been promised anything in exchange for his testimony. Subsequently, Perry confessed to and was charged with the murder of Ivan Leon. Perry testified at a pretrial hearing in that case that he had been promised immunity from prosecution on the Leon murder in exchange for his testimony against the defendant in the instant cause. His testimony on that point was contradicted by the attorney who prosecuted the instant cause. This was brought to the court's attention in the defendant's motion for a new trial.

Cross-examination designed to show that a witness might be vulnerable to pressure, real or imagined, from the authorities regarding a pending charge is a matter of right. (*People v. Kellas* (1979), 72 Ill. App. 3d 445, 453, 389 N.E.2d 1382.) However, where there is no expectation of leniency from the prosecution regarding the pending charge, the trial court may properly prohibit cross-examination regarding that charge. *People v. Martin* (1978), 59 Ill. App. 3d 785, 789-90, 376 N.E.2d 65.

In the case at bar, Perry testified at the *voir dire* examination that to his knowledge he was not under investigation for the Leon murder and that he had not been promised anything in exchange for his testimony. Based on that testimony, the court prohibited cross-examination regarding the Leon murder. Perry's trial testimony was essentially the same as what he had told the police in 1983, two years prior to the Leon murder. We cannot conclude that the court's ruling constituted an abuse of discretion. Our conclusion is not changed by the fact that Perry subsequently testified at his own murder trial, where the motive to fabricate was clear, that he had been promised immunity in exchange for his testimony.

The defendant next contends that the trial court erred in allowing the State to introduce hearsay testimony concerning other crimes and race. Specifically, the defendant objects to Perry's testimony that the defendant committed burglaries and raped women on the north side and Detective Mahon's testimony that the defendant's friends said that the defendant told them he had killed and raped white women. Detective Mahon also testified that the defendant was a suspect in several home invasion murders, including those involving victims

Marilyn Dods, Ellen Johnson and Faustina Gray, all of whom had been found in their bathtubs. No evidence was introduced showing that the defendant had committed the Dods or Johnson murders.

■ Generally, evidence of crimes unconnected to the crime for which the defendant is on trial is inadmissible. (*People v. Connor* (1988), 177 Ill. App. 3d 532, 537, 532 N.E.2d 520.) However, evidence of other crimes is admissible where it shows a consciousness of guilt on the part of the defendant (*People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200) or where the evidence is admitted to establish the circumstances surrounding the defendant's arrest (*People v. Connor*, 177 Ill. App. 3d 532, 532 N.E.2d 520). The admission of other crimes evidence rests within the sound discretion of the trial court, and reversal is not warranted unless there has been an abuse of that discretion. *People v. Connor*, 177 Ill. App. 3d 532, 532 N.E.2d 520.

■ We believe that Perry's testimony was properly admitted at trial to demonstrate the defendant's consciousness of guilt and to establish the circumstances leading to the defendant's arrest for the murder in the instant cause. While Detective Mahon's testimony was improper, we do not believe that it served to prejudice the defendant in light of the strength of the State's case against him. The defendant's contention that the State improperly interjected the issue of race at trial so as to deny him a fair trial is without merit. No argument was made that the instant offense was racially motivated, and the references to race were not so inflammatory that they would prejudice the defendant.

The defendant next contends that the court improperly allowed testimony concerning the defendant's post-arrest silence. Detective Mahon testified that after he gave the defendant the *Miranda* warnings, the defendant said he would to talk to them. Mahon then told the defendant that the police believed he was involved in several murders on the north side, to which the defendant made no reply. Mahon then told the defendant about his suspected involvement in certain murder investigations, and the defendant replied, "I don't know anything about this. I had nothing to do with this." The defendant characterizes Mahon's testimony that he failed to respond to one of the questions as impermissible evidence of post-arrest silence.

■ It is error to comment on a defendant's post-arrest silence. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) However, a mere mention of the defendant's failure to answer a particular question, where the failure is not argued to be indicative of guilt, is not necessarily an impermissible comment on the defendant's post-arrest silence. (*People v. Lindgren* (1982), 111 Ill. App. 3d 112,

117, 443 N.E.2d 1129.) The record before us shows that the defendant agreed to answer questions by the police, failed to answer one question, then went on to answer others. At no time did the State comment upon the defendant's silence or attempt to draw an inference of guilt from his refusal to respond to one of the questions. We therefore find that no error occurred. *People v. Lindgren*, 111 Ill. App. 3d 112, 443 N.E.2d 1129; *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 625, 414 N.E.2d 1318.

The next contention made by the defendant is that the testimony of David Allen West was improper rebuttal testimony and should not have been allowed.

The defense theory at trial was that the defendant did not commit the instant offense and that his confession to the crime was coerced. As support for this theory, he maintained that at the same time he confessed to the instant offense he also confessed to having killed Faustina Gray. However, the Gray murder occurred at a time when he was in the Navy brig. The defendant claimed that because he could not have committed the Gray murder, his confession to the instant murder was also suspect. The testimony of Officer Gabriel was offered to show that the defendant was in the maximum security area of the brig at the time of the Gray murder. Gabriel reviewed the inspection records and testified that they indicated that the defendant was in his cell on the day of the Gray murder. Gabriel admitted on cross-examination that failures in the area of security had occurred and that there had been irregularities in record keeping. David Allen West testified in rebuttal that he had been confined to the medium security area of the brig during the relevant time period and that security was lax. He testified that prisoners were sometimes left unguarded. West admitted that he was in the medium security section of the brig and knew nothing of the maximum security section.

■■ Rebuttal evidence is defined as evidence which explains, repels, contradicts or disproves evidence produced by the accused. (*People v. Bell* (1927), 328 Ill. 446, 451, 159 N.E. 807.) Rebuttal evidence may be used to contradict evidence as to a material issue, but not as to a collateral or immaterial matter. (*People v. Williams* (1981), 96 Ill. App. 3d 958, 964, 442 N.E.2d 199.) The admissibility of rebuttal evidence is a matter left to the discretion of the trial court, and the court's determination will not be reversed absent a clear abuse of that discretion. *People v. Williams*, 96 Ill. App. 3d 958, 442 N.E.2d 199.

■■ West's testimony was presented to contradict matters which went to the heart of the defendant's theory at trial and was therefore not inadmissible as relating to collateral matters. The defendant main-

tains that the testimony was not proper rebuttal because it concerned the medium security rather than the maximum security area of the brig and because Officer Gabriel admitted problems in security at the brig. The trial court, in the exercise of its discretion, decided to allow the testimony. The defendant has not persuaded us that this decision constituted a clear abuse of discretion.

■■ The next contention raised by the defendant is that he was denied a fair trial as the result of the prosecutor's references to prejudicial factors concerning the life of the victim, Mary Beth Duncavage.

During opening argument, the State made several references to the life, interests and career of the victim, including the fact that she was a medical student with an interest in dance. Objections to these comments were sustained. Later, a photograph of the victim wearing a dancer's outfit was allowed to go to the jury. The defendant maintains that these were irrelevant and improper efforts to inflame the passions of the jury.

We believe that the court's prompt action in sustaining objections to the prosecutor's comments served to cure any prejudice that might otherwise have resulted. (*People v. Williams* (1983), 97 Ill. 2d 252, 305-06, 454 N.E.2d 220.) The defendant has not identified any specific prejudice from the court's admission of the photograph, and we do not believe that a new trial is warranted as a result of its admission.

■■ Finally, the defendant contends that a new sentencing hearing is required because the trial court erroneously considered victim-impact evidence.

At the sentencing hearing, the victim's mother testified concerning the effect of the victim's death upon the family. The trial court denied a defense objection to this testimony. A written victim-impact statement was also received into evidence. The State did not refer to the victim-impact evidence when arguing the aggravating factors present in this case. In imposing a sentence of natural life imprisonment, the trial court made the following statement:

> "The crime in this case staggers the human and moral senses and by its horribly unspeakable nature renders one at a loss for words to describe it and its impact. It does, however, bespeak the cruel and heartless perpetrator.
>
> Even in this building, even in this other worldly environment of criminals, degenerates, deceivers, lovers of violence and miscreants of every kind, the defendant, Jackson, stands out as being a genuinely evil person, quintessentially evil person.
>
> Natural life in prison is the only alternative sentence to the

death penalty. There is no reasonable prospect of rehabilitation in this case. Isolation from a free society is the only sentence and necessary sentence to protect society for the self-preservation and the self-defense of society.

Even in the prison population, if it could be so, I think Jackson should be isolated.

The sentence I am now imposing which is on the murder convict, is natural life in prison and on the rape conviction sixty years.

As I have indicated, both sentences are being imposed for the reasons stated by this exceptionally brutal and heinous nature indicative of wanton cruelty in the words of the statute.

I hope that no reviewing court would consider reducing this sentence. If one were here today or here during the course of the trial, no reviewing judge I think could reduce this sentence.

I hope that no future governor would ever take it upon himself to allow Jackson to rejoin a free society and I want those remarks as part of the record in this case."

In *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, it was held that it is reversible error to permit victim-impact testimony during the sentencing phase of a capital case. However, in *People v. Crews* (1988), 122 Ill. 2d 266, 288, 522 N.E.2d 1167, *cert. denied* (1989), 492 U.S. 925, 106 L. Ed. 2d 605, 109 S. Ct. 3260, the Illinois Supreme Court determined that such error may in some instances be harmless. In *Crews*, the victim-impact evidence was presented to a judge rather than a jury, the prosecutor referred to the evidence only once and the trial court did not refer to the evidence when imposing sentence. As in *Crews*, we believe that the error in admitting victim-impact evidence in the case at bar was harmless beyond a reasonable doubt. The prosecutor made no reference to the evidence when arguing the factors in aggravation. It is clear from the trial court's comments, set forth above, that it was the brutal and heinous nature of the crime and the lack of remorse or rehabilitative potential on the part of the defendant which led the court to impose the sentence of natural life imprisonment.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McMORROW, P.J., and JOHNSON, J., concur.