THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GILDEN McCLOM, Defendant-Appellant.

First District (2nd Division)   No. 1—92—0940

Opinion filed May 10, 1994.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Following a bench trial, defendant Gilden McClom was convicted of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1 (now codified as 720 ILCS 5/9—1 (West 1992))) and was sentenced to 30 years in the custody of the Department of Corrections. On appeal, he contends that (1) the circuit court erred in denying his motion to quash his arrest and suppress his identification; and (2) the evidence presented at trial was insufficient because the identification was "vague, doubtful and uncertain."

At trial, the following evidence was presented. Marcella Hayes McNolling testified that her son, Benny Hayes, was 29 years old when he was killed. Alice Sims testified that on February 13, 1990, she arrived home from work at about 2 a.m., and relaxed in the living room of her first-floor apartment at 69th Street and Emerald Avenue in Chicago, reading a newspaper before going to bed. At about 3 a.m., she heard someone on the street yell "hey, hey." She then stood up and looked out her front window to see what was happening. From her window, she saw Hayes and three other men walking south along Emerald and another group of three men,

including defendant, that had just turned the corner onto Emerald. She believed that someone in the second group had yelled in order to get the other group's attention. She quickly turned off the lights and kneeled in front of the window.

As Hayes and his companions turned to look to see who was calling them, defendant approached Hayes and grabbed him. Hayes broke away and tried to run north on Emerald toward 69th, one of his companions ran south, and the other two ran into a vacant lot next to Sims' apartment building and watched from behind the building. As Hayes was running away, defendant took out a "very small gun" and shot him in the back. Despite the wound, Hayes continued to run west along 69th Street, until he collapsed at Halsted Street. Defendant and his companions stood still for a moment, and then ran north on Emerald across 69th Street.

She explained that defendant was standing approximately 20 feet away from her window when he shot Hayes and although it was dark outside, she was able to see clearly because the area outside was well lit by two overhead streetlights and another light across the street. She also stated that both defendant and Hayes faced her apartment during the entire incident.

Still "nervous" from what she had witnessed, she "settled" for a while before going to bed. She did not call the police or tell anyone what she had seen because she was scared and did not want to get involved.

Three days later, she was interviewed by a Chicago police officer and she described the offender as being "[s]hort," "stocky," and "muscle bound." She also told the officer that the offender was wearing a white jacket with three stripes on the sleeves and that his hair was "combed back in curls." Six weeks later, on March 28, 1990, she went to the police station to view a lineup and immediately recognized defendant as the shooter. Although she was positive that defendant was the shooter, she waited several minutes before identifying him because she was nervous, and then only said that she could not positively identify him. When investigators from the public defender's office came to speak with her before the trial, she told them that she "wasn't really sure" when she identified him because she was still in "shock" and just wanted to be left alone. Although she "didn't want to become involved," she decided to testify because she was "subpoenaed."

On cross-examination, she stated that on February 17, 1990, the day after first speaking with the police, she viewed a lineup that did not include defendant and identified another person. Although the record does not disclose what role she attributed to that person, it

does reveal that she remembered that the man she recognized was one of Hayes' companions once the police informed her of that fact.

Chicago police officer Dennis Tooles testified that at approximately 3:10 a.m. on February 13, 1990, he observed a crowd standing in the street at the intersection of Halsted and 69th. When he entered the crowd, he found Hayes lying on the ground. When he asked Hayes what happened, he told him that he had been shot in the back. An ambulance then came and took Hayes to the hospital.

The State then presented the stipulated testimony of Dr. Shaku Teas, an assistant medical examiner, who determined that the cause of death was a gunshot wound to the left flank region of the back. A small caliber bullet perforated the kidneys, pancreas, and liver and was recovered from the muscles in the right abdominal region. The State then rested.

Mack McClom, Jr., defendant's brother, testified for defendant that he would cut defendant's hair once a month and that in February 1990 defendant's hair was "pretty short." Although he sometimes wore it in braids, defendant never wore it in curls. At that time, defendant also had a full mustache and beard. When asked how he was able to remember February 1990 so clearly, he responded that it was around their father's birthday, which was "real important" to them.

On cross-examination, McClom stated that at the time in question, he and his brother lived at 6831 South Emerald in Chicago. He also stated that he could not remember any particular date that he cut his brother's hair and that he did not know the exact date of his father's birthday, although it was "somewhere" around the 15th.

Andre Keith Lewis Bay testified that he and defendant had been friends for six to eight years, and that in February 1990 he saw defendant and defendant's brother at least twice a week because they would spend their days off work together. Around the time of defendant's father's birthday in February 1990, which was "always a big occasion," defendant had a full beard and his hair was one or two inches long and almost "always *** in braids." He explained that "braids" were "[v]ery much different" from "curls"; braids are "natural hair," braided into "cornrows," while curls are chemically treated hair which is "slick and very easy to manage."

Defendant then testified on his own behalf. He stated that in February 1990, he lived at 6831 South Emerald in Chicago. He also stated that he did not know or shoot Benny Hayes and that he was not outside 6905 South Emerald at 3 a.m. on February 13, 1990.

On cross-examination, defendant stated that he was approximately 5 feet 6 inches tall and that in February 1990, he weighed about 180 pounds and sometimes wore his hair in braids.

In rebuttal, the State introduced, over defendant's objection, certified copies of defendant's prior convictions. In 1981, he was convicted of arson and burglary and sentenced to concurrent five-year terms of imprisonment. In 1979, he was sentenced to probation for forgery, but was later sentenced to five years' imprisonment for violating probation.

As previously indicated, the circuit court found defendant guilty of first degree murder. The court expressly stated that defendant's testimony "was not very believable" and that it did not "put any credibility to it." The court also found that although Sims was never asked if she knew the difference between curls and cornrows, her testimony regarding the events and her subsequent identification was believable. Finally, the court stated that while it "wish[ed] there [was] more evidence to make [its] decision," Sims' credible testimony was sufficient to prove defendant guilty beyond a reasonable doubt. Thereafter, the circuit court sentenced defendant to 30 years' imprisonment. This appeal followed.

■ Defendant first contends that the circuit court erred in denying his motions to quash his arrest and suppress the identification. He maintains that the multiple hearsay originally provided by an unidentified informant was insufficient to provide probable cause for defendant's arrest. He also asserts that the subsequent identification should have been suppressed as a fruit of the illegal arrest. The State responds that the evidence adduced at the hearing on the motion demonstrates that defendant was not under arrest but rather voluntarily accompanied the officers to the police station. The State further argues that sufficient probable cause for defendant's arrest did exist once the police had the opportunity to corroborate the information obtained from the informant.

At the hearing on the motion, defendant testified that on March 27, 1990, at about 8:30 p.m., he was standing in front of a neighbor's house at 6837 South Emerald when he noticed two police detectives exit his grandmother's house at 6831 South Emerald and enter an unmarked police car. As they drove past him, they stopped and asked him his name. When he told them his name, they parked the car, told him to place his hands against the car, and patted him down. One of the officers, Detective Kill, then told him to get in the car, and he did not think that he had any choice in the matter. They then took him to a police station where he was placed in a holding pen.

On cross-examination, defendant stated that Detective Kill had previously left a card with his grandmother and asked her to tell defendant to call him. Defendant never called, however. He also stated that there was no partition in the police car and that he was never

handcuffed. When they arrived at the police station, each detective took one of his arms and escorted him up the stairs to the third floor. Finally, defendant stated that he had been arrested numerous times and that, as part of those arrests, he had been handcuffed and read his *Miranda* warnings. Defendant then rested on the motion.

Chicago police detective Thomas Ptak testified for the State that on March 28, 1990, he reported to work at 9:30 a.m. and was asked by Detective Richard Vallandingham to conduct a lineup for him in the investigation of the shooting at 69th and Emerald. Vallandingham, who died approximately one month before the hearing on the motion, then gave him a phone number of a witness. After speaking to Vallandingham, he noticed defendant sitting in the front office near the main interview room. The room was also near the large chain-link cage which is in the center of the roll call area on the third floor. The room was approximately six by eight feet, with numerous filing cabinets, two phones, several chairs, and a desk. The door to the room, which could not be locked, was open and defendant was alone in the room. Defendant was not physically restrained in any way, nor was there anyone standing guard over the entrance to the room. He then spoke with defendant and told him that a lineup would be held. Defendant responded that "he wanted to participate in the lineup." At about 11:45 a.m., after a lineup was held and defendant was identified by a witness, he informed defendant that he was under arrest. Defendant was then placed in the cage.

Detective Michael Kill testified that on March 25, 1990, he was assigned to investigate the shooting death of Benny Hayes, and was told by Detective Vallandingham that Hayes' brother Calvin learned from an informant that a person named "Gil McClom" was the shooter. The next day, Kill obtained defendant's photograph, arrest record, and address. About 9 p.m. that evening, he went to defendant's address and spoke with a woman who said she was defendant's grandmother. He gave her his business card with the phone number and address of the police station and told her to tell defendant to call him "at his convenience." Defendant never called, however.

The following day, at about 11:15 p.m., he returned to the same address and again spoke with defendant's grandmother. She told him that she had given defendant the card and that he had just left. When he asked her where defendant went, she pointed to a crowd of people across the street, but said that he was not in the crowd "and he's not the guy with the red shirt." He understood this to mean that she was pointing defendant out for him. He then went up to the person wearing the red shirt and asked him if his name was "Gliden." The man responded that his name was Gilden McClom, not Gli-

den, and asked what he wanted. He then told defendant that he wanted to talk to him about the shooting that occurred "over the corner, *** a quarter block away" because he had been mentioned as possibly being the shooter. Defendant responded that he did not do the shooting. Defendant then agreed to come to the police station and answer some questions. He frisked defendant to make sure that he did not have any firearms with him before he got in the car, and then walked around to the driver's side of the car while defendant opened the rear door on the passenger side and entered the vehicle. They then drove to the police station. Defendant was not handcuffed.

On the way to the police station, he asked defendant why he never called. Defendant responded that he had just gotten the card from his grandmother and did not have time to call. When they got to the police station, they exited the vehicle and he told defendant to follow him. They then walked up the stairs to the third-floor office of the violent crimes unit; he was in front, followed by his partner, and then by defendant. When they reached the third floor, he directed defendant to an unoccupied office and told him that he would be with him shortly. At no time did he or his partner grab defendant by the arm and lead him up the stairs. The door to the room cannot be locked, nor can it be closed entirely. Moreover, defendant was not physically restrained in any way, and no one watched the room to make sure that defendant did not leave.

He then got the case file and read the reports for the first time. Upon reading the description given by Sims, he noticed that it "closely matched" defendant. He then went to the office where defendant was sitting, told him that he matched the description, and gave him his *Miranda* warnings. Defendant then indicated that he understood his rights and said that he still wanted to talk to the detective. Defendant said that he did not know anything about the shooting, but that he could not remember where he was on that date and at that time. Kill was satisfied with his answers and left the room. Neither he nor his partner ever told defendant that he was under arrest.

Shortly thereafter, around midnight, the shift changed and Detective Vallandingham took over the investigation. He told Vallandingham that defendant was sitting in the office on the third floor. Defendant was alone at the time because both Kill and his partner were on the first floor changing shifts.

On cross-examination, Kill explained that he was looking for defendant in order to make him available for an interview with Vallandingham, because Vallandingham was much more familiar with the case than he. He decided to bring defendant to the station because Vallandingham would be starting his shift shortly thereafter.

On redirect examination, Kill stated that he did not raise his voice to defendant when he spoke to him on the street. Kill's partner, Detective Thomas Byron, gave substantially similar testimony to that of Kill.

Following arguments on the motion, the circuit court denied defendant's motion to quash the arrest. The court first found that "it is not unusual for a person to go to a police station, particularly where that person takes the position that he or she is not a person involved and so indicates to the police." The court then found that, based upon the evidence, probable cause existed for defendant's arrest after Detective Kill noticed the similarities between the offender's description and defendant, even though he was not formally told he was under arrest until after the lineup, several hours later.

Illinois law is well settled that a reviewing court will not disturb a circuit court's finding on a motion to suppress unless it is manifestly erroneous. (*People v. Gacho* (1988), 122 Ill. 2d 221, 234, 522 N.E.2d 1146, *cert. denied* (1988), 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264; *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898.) It is the function of the circuit court in a hearing on a motion to suppress to determine the credibility of the witnesses and to resolve any conflict in their testimony (*People v. Redd* (1990), 135 Ill. 2d 252, 289, 553 N.E.2d 316), and a reviewing court may not substitute its judgment as to the weight of disputed evidence or the credibility of the witnesses. *People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.

Furthermore, an arrest occurs "when a reasonable person, innocent of any crime and in view of all the circumstances surrounding the incident, would believe that he was under arrest or not free to leave." (*People v. Collins* (1989), 182 Ill. App. 3d 362, 364-65, 538 N.E.2d 781, 783, *appeal denied* (1989), 127 Ill. 2d 624, 545 N.E.2d 117.) While the beliefs of the specific individual at issue are legitimate considerations, they are not conclusive. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870.) Rather, "[i]n the absence of a threatening presence of officers, display of a weapon, a physical touching, or use of language or tone of voice which indicates compliance with the officer's request might be compelled, a seizure has not taken place." *Collins*, 182 Ill. App. 3d at 365.

In the instant case, the circuit court considered the State's witnesses to be more credible than defendant when it implicitly found that he voluntarily accompanied the police to the station to answer questions. Furthermore, the evidence in the record supports that conclusion. The record reveals that when defendant entered the

detectives' vehicle and went to the police station, no weapons were drawn, defendant was not handcuffed at any time, and the detectives did not use threatening language or tone of voice. Although Detective Kill did pat down defendant before taking him to the station, he explained that his purpose in doing so was for his own safety rather than to arrest defendant at that time. That fact alone did not render the encounter an arrest, as a police officer may properly conduct a cursory pat-down search in order to ensure his safety and the safety of others. (*People v. Myers* (1993), 246 Ill. App. 3d 542, 546, 616 N.E.2d 633.) Accordingly, we find no basis for concluding that the circuit court erred in finding that defendant voluntarily accompanied the detectives to the police station.

Although no probable cause was necessary when defendant initially accompanied the detectives to the police station, we find no basis for finding that the circuit court erred in holding that sufficient probable cause existed to arrest defendant once Detective Kill had the opportunity to review the case file and observe the similarities between defendant and the description provided by Sims.

Probable cause to arrest is determined by the "totality of the circumstances," a practical, commonsense determination based on all available information. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 527.) The proper standard is whether a reasonable person, possessing the same facts and circumstances as the police officer, would believe that an offense had been committed and that the person arrested had committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147.) The circumstances need not reach the level of proof beyond a reasonable doubt, but rather just render it more probable that defendant committed the offense. *People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 181, 107 S. Ct. 1329.

Sufficient probable cause existed here because Detective Kill knew that defendant had been implicated by an informant, he matched the description, he lived in the area of the offense and in a direction which corroborated Sims' account that after the shooting, the offender headed north on Emerald across 69th Street, and he was unable to account for his whereabouts at the time of the offense. Consequently, no improprieties occurred in defendant's arrest.

Moreover, even if defendant were illegally arrested, defendant's motion to suppress the identification was properly denied because its discovery through a legitimate source was inevitable. (*People v. Edwards* (1991), 144 Ill. 2d 108, 143-44, 579 N.E.2d 336, *cert. denied* (1992), 502 U.S. 853, 119 L. Ed. 2d 204, 112 S. Ct. 2278 (stating that the inevitable discovery doctrine is an exception to the exclusionary

rule).) At the time defendant went to the police station, the police knew that defendant had been implicated as the shooter by an informant and obtained a photograph of him from his arrest record. Had a photo array or other identification procedure been conducted for Sims, it is highly likely that she would have identified defendant at that time. Thus, because defendant's identification would have been obtained regardless of any improper arrest, it would not have been suppressed as a result of an illegal arrest had one actually occurred.

■ Defendant also contends that the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt because Sims' identification was "vague, doubtful and uncertain." He maintains that the identification was insufficient because she had previously stated that she could not positively identify anyone, and because of the discrepancy of the evidence regarding defendant's hairstyle at the time of the offense.

A reviewing court will not set aside a conviction on the ground of insufficient evidence, unless "the evidence is so palpably contrary to the verdict or judgment that it is unreasonable, improbable or unsatisfactory and thus creates a reasonable doubt of guilt." (*People v. Witherspoon* (1991), 216 Ill. App. 3d 323, 333, 576 N.E.2d 1030.) A circuit court's determination will be reversed on appeal only if the reviewing court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) The reviewing court cannot, however, "second-guess the trier of fact's evaluation of the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." (*People v. Murray* (1990), 194 Ill. App. 3d 653, 656-57, 551 N.E.2d 283; see also *People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837, *cert. denied* (1991), 502 U.S. 853, 116 L. Ed. 2d 125, 112 S. Ct. 161.) Furthermore, the identification by a single witness is sufficient to sustain a conviction, even if the identification contains some minor discrepancies. *People v. Slim* (1989), 127 Ill. 2d 302, 309, 537 N.E.2d 317.

In the instant case, the circuit court specifically stated that it found Sims to be a believable witness while defendant was not. Because the court heard all the evidence regarding Sims' reluctance to testify and had the opportunity to observe the witnesses' demeanor and assess their credibility, we cannot second guess that determination. Accordingly, we hold that the evidence was sufficient to sustain defendant's conviction for murder.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.