THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL MONTGOMERY, Defendant-Appellant.

First District (1st Division)    No. 1—97—2531

Opinion filed December 7, 1998.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Tyra Taylor-Bell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

At issue on appeal is: (1) whether the trial court erred in denying defendant's motion to quash arrest and suppress evidence; (2) whether the trial court improperly admitted polygraph evidence during the hearing on the motion to quash arrest and suppress evidence; (3) whether the evidence supports defendant's conviction for first degree murder; (4) whether defendant was proven guilty of aggravated criminal sexual assault beyond a reasonable doubt; and (5) whether defendant's aggregate 100-year sentence was excessive. For the reasons that follow, we affirm.

## I. FACTS

This case concerns the sexual assault and murder of Debbie Vinson. Defendant was indicted on 4 counts of first degree murder, 14 counts of aggravated criminal sexual assault, 6 counts of criminal sexual assault and 1 count of unlawful restraint.

At trial the parties stipulated that if J.D. Stewart, Jr., were called to testify he would state that at about 9:30 a.m. on May 14, 1993, he was in the alley at the rear of a row of businesses in the 1700 block of West 79th Street collecting cans. He discovered the naked, bloody body of the victim, Debbie Vinson. Mr. Stewart phoned the police.

Detective Ernie Bell was assigned the case at 10 a.m. the same day. He proceeded to 1716 West 79th Street to investigate and he observed the victim lying faceup. There was dried blood on her right thigh and genitalia and blood on the grass near the body. The victim's wallet, a Chicago Bears T-shirt, a red gym shoe and black baseball cap were also scattered on the grass near the body. Detective Bell canvassed the area to interview possible witnesses.

The morning of May 15, 1993, Detective Bell spoke with Detective Bernatek, who had worked the midnight shift at Area 2. Pursuant to this conversation, they went to the home of Arthur Robinson. Robinson knew the victim and told Detective Bell that the victim and defendant, known to Robinson only as "Mike," were at his home about 10 p.m. or 11 p.m. the night of May 13, 1993. Robinson gave Detective Bell a physical description of defendant and told him the address of the furniture store where defendant worked.

Detective Bell spoke with Mr. Harris, the owner of the furniture store. Mr. Harris indicated that an individual named "Mike" who matched the physical description worked at the store. Defendant arrived at the store between 5 p.m. and 5:30 p.m. Officer Bell identified

himself, showed his star and then asked defendant his name. Defendant stated his name was "Michael Montgomery" and agreed to go to Area 2 with Detective Bell. The officers did not handcuff defendant.

Upon arriving at Area 2, Detective Williams informed defendant of his *Miranda* rights and interviewed defendant. Defendant stated that he did not know Debbie Vinson, the victim. He stated that on the evening of May 13, 1993, he went home from work, only left home about 9:30 p.m. to find something to eat and then returned home for the night. This interview started at about 5:40 p.m. and lasted approximately 20 minutes.

At about 6:10 p.m., Detectives Bell, Williams and Marbury. reentered the interview room. During this second interview, defendant changed his story. Defendant stated that he knew the victim. He related that he met her on the corner of 79th Street and Racine, showed her a bag of cocaine and went with her to the house of an individual known as "Frank" to smoke the cocaine. Defendant stated that he and the victim engaged in consensual oral and vaginal intercourse in the hallway of a building. Defendant claimed he and the victim parted ways in an alley.

At about noon the following day, Detectives Bell, Williams and Marbury, along with defendant, went to the police station at 11th and State Street. Defendant was introduced to Officer John Stout. Detective Bell spoke with Officer Stout, then interviewed defendant again at about 1 p.m. During this interview, defendant repeated his story from his prior interview. He added that, after smoking cocaine with the victim, he went with her to the hallway of a building where they engaged in consensual intercourse, both oral and vaginal. Defendant then took the victim into an alley, telling her that he was going to obtain more narcotics for her, which he stated he had no intention of doing. Defendant took the victim into an alley where they again engaged in oral and vaginal sex. Defendant stated that the victim started swinging her arms violently and struck him in the head, knocking his glasses off. Defendant stated that he thought he might have been stabbed and was afraid the victim had a weapon. Defendant stated that he then started choking the victim.

The police returned to Area 2 with defendant at approximately 2 p.m., May 16, 1993, and resumed the interview. This interview lasted about an hour. During the interview, defendant repeated his story and added that he choked the victim until she became unconscious, then he went home. Defendant stated that when he arrived at home, he discovered he had blood on the front of his pants, on his underwear, on the front of his shirt and on his shirttail. Defendant stated that he did not know where the blood came from. He threw away the bloody

clothing and returned to the alley where he left the victim. Defendant stated that he placed his fist behind the victim's back to lift her up slightly to check if she was still alive. He determined that she was still alive, then engaged in vaginal intercourse with her again. Afterward, he removed the victim's clothing and threw the clothing in a dumpster because he wanted to make it look like a rape. Defendant then turned the victim over so she was facing the ground and engaged in vaginal or anal intercourse with her, he was not sure which. Defendant then stated he returned to his home and again threw away the clothes he was wearing.

The parties also stipulated that Arthur Robinson would testify that the victim and an unknown man were in his apartment at 7849 South Troop on May 13, 1993, at about 11 p.m. to 11:30 p.m. Robinson described the unknown man as "a black male, six foot tall approximately two hundred thirty pounds, dark skinned, late thirties to early forties." The man told Robinson he worked at a furniture store at 1710 West 79th Street. Robinson would testify that the victim and this man did not appear to be in a hostile relationship. The two used narcotics at his house and, before leaving, the victim asked Robinson for money so she could purchase additional narcotics. Arthur Robinson viewed a lineup at approximately 7:30 p.m. on May 16, 1993. Robinson identified defendant as the individual that was at his home with Debbie Vinson the evening she died. Assistant State's Attorney Nolan interviewed defendant at 10:45 p.m., and defendant repeated the statement he had given to the police earlier that day at 2 p.m.

Dr. Mitra Kalelkar, the deputy chief medical examiner for Cook County, testified on behalf of the State. Dr. Kalelkar performed a postmortem examination on the victim. The external examination revealed an unclothed female body with grass and dandelions on her back and dirt on her knees. The victim's body had hemorrhages over her eyes and abrasions on the bridge of her nose, the right side of her forehead, her chin, the left side of her neck, the angle of the jaw and abrasions on her left and right upper arms. She had abrasions on her knee and right thigh area. Dr. Kalelkar testified that the victim was menstruating at the time and had a wad of paper towel product inside her vagina. The victim had extensive injuries to her anal area. Specifically, the anus was large and gaping with tears at the 12 and 5 o'clock positions. There were extensive hemorrhages in the mucosa of the rectum.

Dr. Kalelkar's internal examination of the victim showed significant injuries to the neck. The victim had hemorrhages on the top of the right side of her neck to the muscle that becomes prominent when turning the head. She had hemorrhages to the inside layer of the neck

muscle that connects the base of the tongue to the thyroid area. She also had hemorrhages in the mucosa of the larynx and trachea. An examination of the victim's tongue revealed multiple tongue bites. Dr. Kalelkar testified that "all of these combined together are hallmarks of a strangulation." The doctor's opinion to a reasonable degree of medical certainty was that Debbie Vinson was strangled to death. Dr. Kalelkar testified that the injuries to the victim's anus were consistent with intrusion by a penis and that "[t]he injuries are so extensive I think besides a penis something else was used." The doctor testified that the victim was strangled after the anal injuries occurred.

On cross-examination, Dr. Kalelkar testified that cocaine use may cause seizures and that bite marks to the tongue may occur in seizure deaths "sometimes, not all the time." The toxicology report on the victim was positive for cocaine and alcohol. On redirect, the doctor testified that a person who suffered a seizure would not have the type of injuries to the neck that she observed on the victim. Dr. Kalelkar stated that Debbie Vinson did not die from a seizure, but died from strangulation.

The defendant presented evidence through stipulation that Leon Stockstill, the victim's live-in boyfriend, would testify that the victim left their apartment at about 10 p.m. on May 13, 1993, to go to the liquor store. Mr. Stockstill would further testify that the victim had five seizures on May 9, 1993. The parties further stipulated that Drs. Khan and Watson of Cook County Hospital would testify that the victim had a 20-year history of seizure disorders for which she was taking medication. The defendant chose not to testify.

The trial judge denied defendant's motion to quash arrest and suppress evidence. The court found probable cause for arrest at approximately 6 p.m. on May 15, 1993, which was during defendant's second interview with the police at Area 2. The court found that probable cause for defendant's arrest existed during that second interview "at the time the defendant changed his story from not knowing or from being home the evening before to actually having been with Miss Vincent [sic] in an apartment and smoking cocaine with her."

Defendant's motion to suppress statements alleged that defendant did not receive his *Miranda* warnings. The court found that it was clear from defendant's own testimony that he knew what the *Miranda* warnings were and that he, in fact, received such warnings. Specifically, the court found that Detective Williams gave defendant his *Miranda* warnings when he was first taken to Area 2. He was again given *Miranda* warnings before the polygraph examination. Defendant was advised of his rights again at Area 2 in the afternoon on May 16, 1993, and later that evening by Assistant State's Attorney Nolan. The

trial court also found that there was no evidence to substantiate defendant's claim that his statements were obtained through psychological coercion. Also, the court found that there was no evidence to substantiate defendant's allegations that his history of substance abuse and treatment impaired his ability to understand the nature and consequences of his interrogation.

Following the bench trial, the court found defendant guilty of four counts of first degree murder and four counts of aggravated criminal sexual assault. The court rejected the prosecution's request for the death penalty and sentenced defendant to an extended term of 70 years in the Illinois Department of Corrections for first degree murder and a consecutive sentence of 30 years for aggravated criminal sexual assault. This appeal followed.

## II. ANALYSIS

Defendant first argues that the trial court erred in denying his motion to quash arrest and suppress evidence. Defendant contends he was arrested without probable cause. The trial court found that probable cause for arrest existed at approximately 6 p.m. on May 15, 1993, which was during defendant's second interview with police at Area 2. Defendant argues that he was under arrest even before the second interview and that probable cause to arrest did not exist until after 4 p.m. on May 16, 1993. The State maintains that the trial court properly denied defendant's motion to quash arrest and suppress evidence. The State asserts that probable cause was established during defendant's voluntary appearance at the police station.

■ A reviewing court will overturn a trial court's ruling on a motion to quash the arrest and suppress evidence only where the trial court's ruling is manifestly erroneous. *People v. Adams*, 131 Ill. 2d 387, 400, 546 N.E.2d 561 (1989). "Manifestly erroneous" or "against the manifest weight of the evidence" occurs where the trial court's ruling is " 'palpably erroneous and wholly unwarranted' or 'arbitrary, unreasonable, and not based upon the evidence.' " *People v. Leach*, 245 Ill. App. 3d 644, 655, 612 N.E.2d 825 (1993), quoting *People v. Shelby*, 221 Ill. App. 3d 1028, 1039, 582 N.E.2d 1281 (1991).

■ A person has been arrested when his or her freedom of movement has been restrained by physical force or a show of authority. *People v. Melock*, 149 Ill. 2d 423, 436, 599 N.E.2d 941 (1992). In determining whether a suspect has been arrested, the relevant inquiry is whether, under the circumstances, a reasonable, innocent person in defendant's situation would conclude that he was not free to leave. *People v. Eddmonds*, 101 Ill. 2d 44, 61 (1984). In the absence of a threatening presence of police officers, display of a weapon, physical

contact or the use of language suggesting compliance with the officer's request might be compelled, an arrest has not occurred. *People v. McClom*, 262 Ill. App. 3d 826, 833, 635 N.E.2d 677 (1994).

■ In determining whether probable cause existed to effectuate a warrantless arrest, a court must look to the totality of the circumstances and make a practical, commonsense decision whether there was a reasonable probability that an offense was committed and that the defendant committed it. *People v. Tisler*, 103 Ill. 2d 226, 237-38, 469 N.E.2d 147 (1984), citing *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983). The determination, which considers only information available to officers before the arrest, must focus on the factual considerations upon which reasonable, prudent people, not legal technicians, act. *People v. Adams*, 131 Ill. 2d 387, 398, 546 N.E.2d 561 (1989); *People v. Henderson*, 266 Ill. App. 3d 882, 640 N.E.2d 1344 (1994).

■ Here, Arthur Robinson told Detectives Bell and Bernatek that he last saw the victim with defendant. Robinson supplied the officers with a physical description of defendant, his first name and his work address. The officers went to defendant's place of employment and, when defendant arrived, he matched the physical description. Further, the victim was last seen about a block from defendant's home and her body was found in the vicinity of where defendant worked at the furniture store. Additionally, defendant was the last person seen with the victim. Defendant was seen smoking cocaine with the victim late in the evening on May 13, 1993. Her body was discovered in the alley the next morning. Accordingly, the amount of time that had elapsed from the last sighting of the victim with defendant to the time her body was discovered by Mr. Stewart was minimal. Moreover, when defendant first spoke with police at Area 2, he told them that he did not know the victim and that he was at home the evening of May 13, 1993. However, when defendant spoke with police the second time, he changed his story and said that he had actually been with the victim in an apartment and smoked cocaine with her. Taking all of the foregoing into consideration, we hold that, based on the totality of the circumstances, the trial court's finding that there was probable cause for defendant's arrest at the second interview at Area 2 when defendant changed his story was not against the manifest weight of the evidence.

Further, we find that defendant was not under arrest until after his second interview at Area 2, which was at about 6:10 p.m. When the police arrived at defendant's workplace, defendant voluntarily agreed to accompany them to the station for questioning. He was not placed in handcuffs, nor was he patted down before entering the police car. Prior to his second interview, defendant was not handcuffed,

fingerprinted or photographed. The facts that the questioning took place in a police station and that the police drove respondent to the station are not sufficient to convert the questioning into an arrest. See *People v. Matthews*, 205 Ill. App. 3d 371, 402, 562 N.E.2d 1113 (1990). When a person voluntarily accompanies police, he is not subjected to improper custodial interrogation even though he remains at the police station for some time and is periodically questioned in the course of an ongoing investigation. *People v. Davis*, 142 Ill. App. 3d 630, 636, 491 N.E.2d 1285 (1986). The words of our supreme court are particularly noteworthy in this regard:

> "What actually took place here was no more than what was minimally necessary for the police to successfully investigate a crime, as is their duty. They were informed that a certain individual might have some knowledge about two burglaries. They asked this individual to come to the station so that they could question him about the burglaries. To hold that this amounted to an arrest would be to hold that virtually any station-house interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. This would mean that the police could not request the presence of anyone, even for noncustodial questioning, unless and until they had probable cause to arrest the person to be questioned. We see no reason to so restrict the investigatory function of the police." *People v. Wipfler*, 68 Ill. 2d 158, 168, 368 N.E.2d 870 (1977).

The trial court found that probable cause for defendant's arrest existed at the second interview at Area 2 when defendant changed his story. It should be noted that only 30 minutes separated the first and second interview. The first interview started around 5:40 p.m. and lasted approximately 20 minutes. It was during the second interview, which began around 6:10 p.m., that defendant changed his story.

The trial court specified the factors that established probable cause, including the fact that the police had information that defendant had been seen at Arthur Robinson's home hours before the victim was killed. The trial court also noted that the detectives had defendant's home address, which was one block from the area where the victim was discovered, there were at most 10 hours between the time defendant was seen with the victim and the time her body was discovered, and only 4½ hours between discovery and dawn. The trial court concluded that all of this information, taken together with the fact that defendant first lied, then admitted 20 minutes later that he had been with the victim shortly before her death, was sufficient to establish probable cause to arrest. Accordingly, the trial court's denial of the motion to quash arrest and suppress evidence was not manifestly erroneous.

Defendant next contends that his conviction must be reversed and the matter remanded because the trial court improperly admitted polygraph evidence. We disagree.

■ The results of a polygraph examination, in any manner and at any stage of a defendant's criminal trial, are clearly inadmissible as proof of guilt or innocence. *People v. Baynes*, 88 Ill. 2d 225, 240, 430 N.E.2d 1070 (1981); *People v. Taylor*, 101 Ill. 2d 377, 391-92, 462 N.E.2d 478 (1984). Likewise, testimony about the specific questions asked is inadmissible. *People v. Melock*, 149 Ill. 2d 423, 599 N.E.2d 941 (1992). However, the prohibition against the introduction of polygraph evidence is not absolute. Polygraph evidence may be considered as a factor in determining whether the defendant gave a statement voluntarily. *People v. McClellan*, 232 Ill. App. 3d 990, 1002, 600 N.E.2d 407 (1992); *People v. Jackson*, 198 Ill. App. 3d 831, 846, 556 N.E.2d 619 (1990).

■ Here, the polygraph evidence was not admitted at trial. Testimony regarding defendant's polygraph examination was admitted only at the hearing on defendant's motion to suppress statements and quash arrest. Significantly, at this hearing the issue addressed was not the guilt or innocence of the defendant but, rather, the voluntariness of the defendant's confession. Officer Stout, a polygraph examiner with the Chicago police department, stated that he administered a polygraph exam to defendant at about noon on May 16, 1993. Defendant had volunteered to take the exam, was read his *Miranda* rights, was not handcuffed during the exam and met with Officer Stout alone. The detectives did not come in and out of the examination room. During Officer Stout's testimony on direct examination at the pretrial hearing, the following colloquy occurred regarding the polygraph examination:

"Q. What was the result of your examination of the questions concerning the facts of the case?

A. My opinion was that Mr. Montgomery was not being completely truthful with us. I then continued having conversations with him, and he did make a statement to me implicating himself in the incident.

\* \* \*

Q. After [defendant] made that admission to you, what did you do?

A. I then left the room for a brief moment, got the detectives, and we went back into the room together, and the defendant repeated the statement in the presence of myself and the detectives."

On cross-examination, Officer Stout testified as follows:

"Q. You told [defendant] that something wasn't right, is that correct?

A. Yes.

Q. And then thereafter are you saying he made a statement back to you?

A. Yes."

On redirect, Officer Stout testified:

"Q. Did you tell the defendant that the polygraph examination you thought there was some deception on his part?

A. Yes."

We find that the polygraph evidence was properly introduced in the pretrial hearing as a factor in determining whether defendant voluntarily confessed. The gist of Officer Stout's testimony was that defendant confessed to the murder after Officer Stout told defendant that he did not believe defendant was being completely truthful. Accordingly, Officer Stout's testimony was properly used to show the circumstances surrounding defendant's confession. Such evidence was probative of voluntariness and relevant to show that defendant was not coerced into confessing.

In *Jackson*, defendant testified at trial that police coerced him into confessing by repeatedly threatening physical violence. The State then introduced evidence that the actual reason defendant confessed was that he was informed he failed his polygraph exam. The court pointed to the language in *Triplett* which states, " '[i]t can be said that the fact that the confession followed a polygraph examination is a relevant circumstance and that it is the fact of the examination, rather than its result, that is significant.' " *Jackson*, 198 Ill. App. 3d at 845, quoting *People v. Triplett*, 37 Ill. 2d 234, 239, 226 N.E.2d 30 (1967). The *Jackson* court concluded that the polygraph evidence was admissible for the limited purpose of showing that it was defendant's failure to pass the test, not the alleged threats of physical coercion by the police, that caused defendant to confess. *Jackson*, 198 Ill. App. 3d at 846. Here, as in *Jackson*, the polygraph evidence is being admitted to show that it was defendant's failure to pass the test that caused him to confess, not police coercion.

We find the first district's comments in *People v. Avery* to be instructive:

"The rule against admitting polygraph evidence is premised on two concerns: (1) such evidence is unreliable and thus infringes on the integrity of the judicial process; and (2) such evidence may appear to a jury as being completely determinative of guilt. [Citation.] Here, where a trial judge has merely heard polygraph evidence on the question of voluntariness during a motion to suppress, then hears the bench trial concerning the same defendant and states

during the latter that he will not consider polygraph evidence adduced at the former, these concerns are not implicated." *People v. Avery*, 227 Ill. App. 3d 382, 393, 592 N.E.2d 29 (1991).

The court in this case, heard polygraph evidence during the hearing on the motion to suppress on the question of voluntariness. Polygraph evidence was not admitted at trial. Polygraph evidence was introduced to determine the voluntariness of defendant's statement, not as evidence of defendant's guilt. *Avery*, 227 Ill. App. 3d at 393. This court has approved a trial judge's consideration of polygraph evidence relating to voluntariness in the context of a motion to suppress. *People v. Hattery*, 183 Ill. App. 3d 785, 822-23, 539 N.E.2d 368 (1989). Accordingly, we find that the trial court did not commit reversible error.

Turning to defendant's third contention, he argues that his conviction for first degree murder should be reversed because the evidence established, at most, involuntary manslaughter or second degree murder.

■ Where the sufficiency of the evidence is challenged on appeal, the relevant question is whether a rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *People v. Clemons*, 277 Ill. App. 3d 911, 923, 661 N.E.2d 476 (1996). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Clemons*, 277 Ill. App. 3d at 923. The evidence at trial must be viewed in a light most favorable to the prosecution, and the reviewing court is not permitted to substitute its judgment for that of the trier of fact on questions involving weight of the evidence, credibility of witnesses or resolution of conflicting testimony. *People v. Feazell*, 248 Ill. App. 3d 538, 545, 618 N.E.2d 571 (1993).

■ The first degree murder statute states, in relevant part, as follows:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

\*\*\*

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9—1(A)(2) (West 1996).

■ Here, ample evidence supported defendant's conviction for first degree murder. We find that the trial court properly convicted defendant of first degree murder where defendant possessed the knowledge that strangulation would cause great bodily harm or death and defendant was not provoked into committing the act.

Defendant stated to the police that the victim started swinging her arms violently and struck him in the head, knocking his glasses off. The trial court found that if the victim did become violent towards defendant, this was in response to the great pain and suffering he was inflicting upon her.

Although the victim had suffered seizures in the past, Dr. Kalelkar explicitly stated that in her professional opinion the bite marks on the victim's tongue were caused from strangulation. The medical evidence established that the hemorrhages to the victim's neck muscles, tongue bites and significant injuries to the neck, indicated death by strangulation. In light of all of the foregoing, a rational trier of fact clearly could have found the essential elements of the crime beyond a reasonable doubt.

For defendant's fourth contention, he asserts that he was not proven guilty of aggravated criminal sexual assault beyond a reasonable doubt.

■ It is not the function of the reviewing court to retry a defendant; rather, it is for the trier of fact to weigh the evidence, determine the credibility of witnesses, and to resolve any conflicts in the evidence. *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989); *People v. Buffman*, 260 Ill. App. 3d 505, 512, 636 N.E.2d 783 (1994). The trier of fact is free to accept or reject any or all of a witness' testimony. *People v. Harris*, 220 Ill. App. 3d 848, 863, 580 N.E.2d 1342 (1991). A reviewing court will not overturn a criminal conviction unless the evidence is so improbable that it raises a reasonable doubt of guilt. *People v. Vriner*, 74 Ill. 2d 329, 342, 385 N.E.2d 671 (1978).

■ An accused commits criminal sexual assault if he or she "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12—13(1) (West 1996). An accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and the accused caused bodily harm to the victim during the commission of the offense. 720 ILCS 5/12—14(a)(2) (West 1996).

■ We note that "sexual penetration" is defined as follows:
" 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." 720 ILCS 5/12—12(f) (West 1996).

■ We find that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant guilty of aggravated criminal sexual assault beyond a reasonable doubt. The

evidence clearly indicates that defendant had sexual relations with the victim without her consent. The extensive injuries to the victim's rectum indicate that sexual relations were not consensual. Dr. Mitra Kalelkar, the deputy chief medical examiner for Cook County, testified the anus was large and gaping with tears at the 12 and 5 o'clock positions. There were extensive hemorrhages in the mucosa of the rectum. Dr. Kalelkar testified that the injuries to the victim's anus were consistent with intrusion by a penis and that "[t]he injuries are so extensive I think besides a penis something else was used."

Further, Dr. Kalelkar testified that the victim had a wadded up paper towel inside her vagina. The State argued that consensual vaginal intercourse under such conditions would be difficult and uncomfortable. A rational trier of fact could certainly have found that any vaginal intercourse entered into at this juncture was against the victim's will. Further, the evidence indicated that defendant himself told the police that he had either vaginal or anal intercourse with the victim, he did not know which.

In support of defendant's argument that he was not proven guilty beyond a reasonable doubt, he states that no semen was recovered. However, evidence of emission of semen is not required to prove sexual penetration. 720 ILCS 5/12—12(f) (West 1996).

For defendant's final contention, he argues that his aggregate 100-year sentence was excessive. We find that the trial court properly sentenced defendant.

■ By his failure to file a postsentencing motion as required by section 5—8—1(c) of the Unified Code of Corrections (730 ILCS 5/5—8—1(c) (West 1996)), defendant has waived review of his sentence. *People v. Reed*, 282 Ill. App. 3d 278, 282, 668 N.E.2d 51 (1996). Moreover, the record reveals no fundamental injustice that requires application of the plain error rule. *People v. Moncrief*, 276 Ill. App. 3d 533, 659 N.E.2d 106 (1995). Accordingly, defendant's contention that his sentence was excessive is rejected.

Waiver aside, the sentence imposed by the circuit court will not be disturbed on review absent a clear abuse of discretion. *People v. Harris*, 187 Ill. App. 3d 832, 843, 543 N.E.2d 859 (1989). Moreover, a circuit court's imposition of a sentence is entitled to substantial weight and deference, since it is in the best position to determine the circumstances of the case, to weigh the credibility of the witnesses, and to evaluate the record made at the hearing in aggravation and mitigation. *People v. Burke*, 164 Ill. App. 3d 889, 518 N.E.2d 372 (1987).

Here, defendant was sentenced to an extended term of 70 years in prison for first degree murder and a consecutive sentence of 30 years for the aggravated criminal sexual assault. Indeed, the trial court

noted the mitigating factors of the letters written by prison personnel as well as defendant's military service. Taking the mitigating factors into account, the trial court rejected the prosecution's request for a death sentence.

Moreover, the seriousness of the crime has been called the most important factor to be considered in sentencing. *People v. Marsan*, 238 Ill. App. 3d 470, 473, 606 N.E.2d 344 (1992). Here, the evidence showed that the crime defendant committed was exceptionally brutal and heinous. Thus, we have no basis for concluding that defendant's sentence was an abuse of discretion.

The law's purpose and spirit are upheld when the sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitation potential of the defendant. *People v. Wyatt*, 186 Ill. App. 3d 772, 778-79, 542 N.E.2d 872 (1989). In sentencing the defendant the trial court balanced defendant's need for rehabilitation with society's need for protection. Clearly the trial court considered evidence in aggravation and mitigation, as well as defendant's background. In aggravation, the defendant had been convicted of armed robbery in 1997 and had been convicted of robbery in 1989 and 1990.

Taking into consideration the exceptionally brutal and heinous acts committed by defendant upon the victim, the defendant's criminal background and the defendant's lack of rehabilitative potential, the trial court properly sentenced defendant. Accordingly, defendant's conviction and sentence are affirmed.

█ As part of our ruling, pursuant to *People v. Nicholls*, 71 Ill. 2d 166, 374 N.E.2d 194 (1978), and the Counties Code (55 ILCS 5/4—2002.1 (West 1992)), we grant the State's request and assess defendant $100 as costs for this appeal. In addition, pursuant to *People v. Agnew*, 105 Ill. 2d 275, 473 N.E.2d 1319 (1992), and the Counties Code (55 ILCS 5/4—2002.1 (West 1992)), we assess defendant an additional fee of $50 for oral argument.

The judgment of the circuit court is affirmed.

Affirmed.

O'BRIEN, P.J., and TULLY, J., concur.